IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:25-CR-211 |
| ROBERT LOUIS RUBIN, | |
| Defendant. | |

## **CRIMINAL INFORMATION**

The United States Attorney Charges That:

## **GENERAL ALLEGATIONS**

At all times material to this Criminal Information, unless stated otherwise:

1.    Company 1 was an Alabama corporation, with headquarters in Herndon, Virginia, engaged in the business of providing protective security officers at federal workplaces in numerous states.   From at least 2010 to 2023, Individual 1 was the president of Company 1.

2.    From at least 2010 to 2020, defendant ROBERT LOUIS RUBIN served as Vice-President of Business Development for Company 1.   From January 2020 to December 2022, defendant ROBERT LOUIS RUBIN served as the Vice-President of Business Development and a Managing Director for Company 1's parent corporation.

3.    Defendant ROBERT LOUIS RUBIN owned Cyrus Strategies, a consulting firm based in Bethesda, Maryland.

4.    MCKHU, Inc. was a consulting company incorporated in Ohio.   In January 2015, Individual 1 and his daughter (Individual 2) incorporated MCKHU, Inc.   Two of Individual 1's sons, Individual 3 and Individual 4, both Company 1 employees, would thereafter operate a side

business under the name, MCKHU, Inc. MCKHU, Inc. was used as a vehicle for Individual-1 and Individual-1's family members to receive payments from Company-3.

5.      Company 3 was a Maryland corporation engaged in the business of providing protective security officers at federal workplaces.

6.      Individual 5, defendant ROBERT LOUIS RUBIN's sister-in-law, was the founder, incorporator, and an initial director of Company 3. From its incorporation to the present, Individual 5 served as Company 3's chief executive officer and president.

7.      From January 2008 to October 2023, Individual 6 served as Company 1's Vice-President of Operations.

8.      Sometime in 2016, Individual 6 agreed with Individual 1 to form a corporation which would act as a subcontractor to Company 1 but appear as a woman-owned or disabled veteran-owned business. In June 2016, Individual 6 formed Company 4 with "Michelle Grisgby" as its owner, director, and president.

9.      The legal name of the person identified as Michelle Grigsby in Company 4's incorporation documents is not Michelle Grigsby. That person is Individual 7, and she uses a different legal name than Michelle Grigsby. Individual 7 is Individual 6's wife.

10.     On January 1, 2017, Individual 7 transferred ownership of Company 4 to Individual 8, her father. Individual 8 was a retired Navy veteran living in a retirement home in Maryland. Individual 8 functioned as a straw owner and performed no work for Company 4. On October 1, 2018, Individual 8 sold his entire interest in Company 4 to Individual 9. Individual 7, using the name Michelle Grigsby, remained the president of Company 4 throughout these ownership changes.

**Count One**
**Conspiracy**
**(18 U.S.C. § 371)**

11.     The allegations contained in paragraphs 1 through 10 of this Information are realleged and incorporated by reference as if set forth fully herein.

12.     Beginning at least as early as 2014, and continuing at least through June 2023, both dates being approximate, in the Eastern District of Virginia and elsewhere, defendant

**ROBERT LOUIS RUBIN**

did willfully, and knowingly, combine, conspire, confederate, and agree with Individual 1, and other persons both known and unknown to the United States Attorney, to commit certain offenses against the United States, that is: for defendant ROBERT LOUIS RUBIN to knowingly and willfully solicit, accept and attempt to accept, kickbacks, specifically, money, fees, commissions, credits, gifts, gratuities, things of value and compensation from subcontractor employees, that is from Individual 5 as an employee of Company 3 and Individual 6 and Individual 7 as employees of Company 4, that were provided so that defendant ROBERT LOUIS RUBIN and Individual 1 would improperly reward and give favorable treatment in connection with the award of security services contracts and subcontracts to Company 3 and Company 4, in violation of Title 41, United States Code, Section 8702(2); and

**Manner and Means of the Conspiracy**

13.     The manner and means by which defendant ROBERT LOUIS RUBIN and his coconspirators sought to accomplish the object and purpose of the conspiracy included, among others, the following:

3

14.     Defendant ROBERT LOUIS RUBIN and Individual 1 would secretly participate in the operation of Company 3 and Company 4.

15.     Individual 1 would exercise significant hidden influence over many of Company 3 and 4's decisions and operations.

16.     Individual 5, Individual 6, and Individual 7, concealed defendant ROBERT LOUIS RUBIN, Individual 1, Individual 3 and Individual 4's involvement and operation of Company 3 and Company 4.

17.     When Company 3 was formed in 2014, Individual 1 directed that the ownership on paper was divided between Individual 5 at 51 percent, Cyrus Strategies (ROBERT LOUIS RUBIN) at 24.5 percent, and MCKHU (Individual 3 and Individual 4) at 24.5 percent.   The paper ownership was drawn in the above manner by Individual 1 so that it appeared that Individual 5 owned a majority of Company 3, which would allow Company 1 to bid on security contracts with the federal government using Company 3 as a woman-owned subcontractor.   Company 1 would not be able to legitimately bid on those contracts had it been known that Individual 5 was a straw owner who did not own at least 51 percent of Company 3.

18.     It was further part of the conspiracy that Individual 1 had an unwritten, under-the-table agreement with defendant ROBERT LOUIS RUBIN, Individual 3, Individual 4, and Individual 5 that the proceeds of Company 3 would be divided one-third for Individual 5, one third for Cyrus Strategies (defendant ROBERT LOUIS RUBIN), and one-third for MCKHU (Individual 3 and Individual 4).

19.     It was further part of the conspiracy that Individual 1 had an unwritten, under-the-table agreement with defendant ROBERT LOUIS RUBIN, Individual 3, Individual 4, Individual 6 and Individual 7 that the proceeds of Company 4 would be divided as follows: forty percent for

Individual 6 and 7, twenty percent for defendant ROBERT LOUIS RUBIN, and the remaining forty percent to Individual 1, Individual 3 and Individual 4.

20.    From the inception of Company 4, Individual 1 had an unwritten, under-the-table agreement with the parties below that, despite the ownership interests on paper, the ownership and proceeds of Company 4 would be divided as follows: Individual 6 and Individual 7at 40 percent; Individual 1, Individual 3, and Individual 4 at 40 percent and defendant ROBERT LOUIS RUBIN at 20 percent.

21.    The straw ownership of Individual 7, and then Individual 8 and Individual 9, permitted Company 1 to bid on security contracts with the federal government using Company 4 as, alternatively, a woman-owned and service-disabled veteran-owned subcontractor.  Company 1 would not be able to legitimately bid on those contracts had it been known that Michelle Grigsby, Individual 8, and Individual 9 were straw owners who did not own at least 51 percent of Company 4.

22.    Individual 1 and defendant ROBERT LOUIS RUBIN's support of Company 3 contributed to Company 3 being awarded millions in contract proceeds as a subcontractor to Company 1. Similarly, Individual 1 and defendant ROBERT LOUIS RUBIN's support of Company 4 contributed to Company 4 being awarded contract proceeds as a subcontractor to Company 1.

### Overt Acts

### <u>Company 3</u>

23.    In furtherance of the conspiracy and to accomplish its objects and purposes, at least one of the coconspirators committed and caused to be committed, in the Eastern District of Virginia and elsewhere, at least one of the following overt acts, among others:

24.    Beginning at least as early as 2014, and continuing at least through June 1, 2023, Individual 1, acting on behalf of Company 1, agreed to award lucrative subcontracts to Company 3 to supply private security guards at various federal installations.  For example, on or about October 3, 2014, Individual 1, on behalf of Company 1, and Individual 5, on behalf of Company 3, executed a subcontract whereby Company 3 would supply protective security officers for Company 1 as the prime contractor with United States Department of Homeland Security, Federal Protective Service at federal workplaces in New England.

25.    In December 2015, Individual 1 directed that Cyrus Strategies and MCKHU would sell their 24.5 percent shares in Company 3 back to Individual 5 for $100 each and thereafter assist in Company 3's operation pursuant to consulting agreements. The separate consulting agreements dated December 31, 2015, executed between Company 3 and Cyrus Strategies and MCHKU provided for a $7,500 per month retainer and $225 per hour fee for hours in addition to the retainer. The parties never observed those agreements.

26.    In or around January 2016, Cyrus Strategies and MCKHU each took $9,000 payments from Company 3 before the month had ended.

27.    On or about October 1, 2019, Individual 1 on behalf of Company 1, and Individual 5, on behalf of Company 3, executed a five-year subcontract whereby Company 3 as subcontractor would supply protective security officers for Company 1 as the prime contractor with United States Department of Homeland Security, Federal Protective Service at federal workplaces in Southern Virginia.

28.    On or about December 12, 2020, Company 3 transferred $15,000 to a bank account held by Cyrus Strategies, LLC.

29.     On or about August 22, 2022, Company 3 transferred $25,000 to a bank account held by Cyrus Strategies, LLC.

### Company 4

30.     On or about January 1, 2019, Individual 1, on behalf of Company 1, and Individual 7, on behalf of Company 4, executed a five-year subcontract whereby Company 4 would supply protective security officers for Company 1 as the prime contractor with United States Department of Homeland Security, Federal Protective Service at federal workplaces in Illinois.

31.     On or about February 1, 2019, Individual 1, on behalf of Company 1, and Individual 7, on behalf of Company 4, executed a five-year subcontract whereby Company 4 would supply protective security officers for Company 1 as the prime contractor with United States Department of Homeland Security, Federal Protective Service at federal workplaces in Ohio.

Respectfully submitted,

Erik S. Siebert
United States Attorney

Date: July 15, 2025     By: _____

Drew Bradylyons
Kathleen E. Robeson
Assistant United States Attorneys
Vincent Falvo, Jr.
Trial Attorney for the Department of Justice's
Violent Crime and Racketeering Section